455 F.2d 1192
 Hurklee CAREY, Plaintiff-Appellee,
v.
LYKES BROTHERS STEAMSHIP COMPANY, INC., et al.,
Defendants-Third-Party Plaintiffs-Appellees-Cross Appellants,
v.
RYAN STEVEDORING COMPANY, Inc., Third-Party
Defendant-Appellant-Cross Appellee.
 No. 71-3053 Summary Calendar.*
 United States Court of Appeals,
Fifth Circuit.
 Feb. 23, 1972.
 
 W. Boyd Reeves, T. K. Jackson, III, Mobile Ala., for appellant.
 Ross Diamond, III, Mobile, Ala., for Carey.
 John H. Tappan, Mobile, Ala., for Lykes.
 Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 Hurklee Carey (Carey) was employed by Ryan Stevedoring Company, Inc., (Ryan) as a longshoreman at Mobile, Alabama, on May 3, 1969, when he was ordered into the starboard deep tank of the vessel S.S. LOUISE LYKES, owned by the Lykes Brothers Steamship Company, Inc., (Lykes). While working in that tank Carey became unconscious and was taken to a hospital. Carey subsequently brought this action against Lykes on the theory that he had sustained disabling injuries from inhaling carbon monoxide gas present in the tank as a result of the vessel's unseaworthiness. Lykes answered the complaint and filed a third-party action against Ryan contending that Ryan had breached its warranty of workmanlike performance under the doctrine of Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. Ryan answered by denying that the vessel was unseaworthy and by denying the breach of any warranties to Lykes. The jury found for the plaintiff in the amount of $50,000.00. On the basis of the verdict and special interrogatories submitted to the jury, the district court entered judgment for that amount for Carey against Lykes and in favor of Lykes against Ryan. Lykes has appealed from the lower court's judgment and Ryan has appealed from that court's denial of its motions for judgment n.o.v. or for a new trial. We affirm.
 
 
 2
 At trial Carey introduced evidence tending to establish the following sequence of events. The gang in which Carey was working was to load mixed military cargo into the deep tanks of the number two hatch aboard the vessel. The men reported to work at approximately 8:00 A.M., May 3, 1969, and began by rigging the booms and by uncovering the hatch. Only the aft halves of the hatch covers at the main deck level were removed. After planking was placed across the bottom of the deep tanks, a gasoline operated forklift machine was lowered into each tank. There was very little natural ventilation to the deep tanks and Ryan provided one small portable blower for each tank. It appears that the air hoses used by Ryan to conduct fresh air into the tanks were inadequate as to size and also were constricted further by being crimped where the hoses crossed the hatch coamings. The blower failed on several occasions during the course of that morning, according to testimony. Carey and several other men in the starboard deep tank became dizzy and nauseous between 10:30 and 11:00. At approximately 10:30 A.M. a test for carbon monoxide concentration was made by Ryan's ship superintendent and it showed a concentration of 200 parts per million (.02%) in the deep tank. Although a regulation of the U. S. Department of Labor[1] required the cessation of work when carbon monoxide concentrations exceed 100 parts per million (.01%), work has not halted and no changes were made to the ventilation system.[2]
 
 
 3
 Following lunch, at which Carey was sick and dizzy, the gang returned to work at 1:00 P.M. only after extracting a promise from Ryan that additional blowers would be installed to remove gas from the tanks. During the lunch hour the hatch covers were replaced at the main deck level and the hatch remained closed. Before the additional blowers were put in place, another carbon monoxide concentration test was made at 2:30 P.M., revealing 200 parts per million. At approximately 2:45 P.M. Carey passed out and had to be carried off the ship, to be followed by three other men one-quarter hour later. Carey consulted several physicians and was ultimately diagnosed as having interstitial pulmonary fibrosis. This condition, according to Carey's medical evidence, was proximately caused or accelerated by the carbon monoxide intoxication suffered on May 3, 1969.
 
 
 4
 Before jury challenges were exercised, the trial judge announced that thirty-four veniremen had qualified, that fourteen (two alternates) were to be selected, and that Carey would be entitled to strike ten and Lykes and Ryan would be entitled to strike ten between them. Ryan claims that it was severely prejudiced by this procedure in that its interests were adverse to those of Lykes. We find no merit in Ryan's argument on this point because the procedure employed by the district judge is expressly authorized by Section 1870, Title 28, United States Code.
 
 
 5
 Ryan next complains that Carey failed to establish that his lung condition was proximately caused by the carbon monoxide poisoning incident of May 3, 1969. There was conflicting expert testimony on this issue at the trial. Applying the standard promulgated by this Court en banc in Boeing Company v. Shipman, 1969, 411 F.2d 365, we conclude that the jury's resolution of this contested issue should not be disturbed on appeal.
 
 
 6
 Next, Ryan urges that the district court erred in refusing to give a requested instruction on the issue of operational negligence, citing Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562. In Usner, the Supreme Court held that where a longshoreman's injuries were not caused by the condition of the ship, her appurtenances, her cargo or her crew but were occasioned by the isolated, personal negligent act of a fellow longshoreman, the shipowner was not liable to the longshoreman on the ground of the vessel's unseaworthiness. The personal, negligent act involved in Usner was a winch operator's improper lowering of a cargo sling. Ryan argues on this appeal that its superintendent's failure to remove the gang from the tank when a reading of 200 parts per million was obtained was equivalent to the operational negligence dealt with in Usner. The Supreme Court's Usner doctrine is not applicable to this case for the reason that the deep tank itself, as a result of an accumulation of carbon monoxide, was an extremely hazardous place in which to work. The hazardous nature of the deep tank was not brought about by the isolated, personal negligent act of a fellow longshoreman but by the failure to provide adequate ventilation over a period of several hours for an area in which a gasoline-powered forklift was being employed. We find this assignment of error to be without merit.
 
 
 7
 Ryan's final argument on this appeal is to the effect that the jury's verdict was clearly excessive and that a remittitur should be granted. Although Carey was earning relatively small annual sums as a longshoreman in the years prior to his accident, considering Carey's medical expenses and his projected future work life (Carey was a 43-year-old Negro longshoreman untrained for other work, and incapable of other than manual labor at the time of the accident), the jury's verdict as to damages was easily within permissible limits, and should not be upset on appeal.
 
 
 8
 Lykes has adopted Ryan's appellate contentions, and, in addition, urges reversal based upon the admission of a hypothetical question propounded to a medical witness at trial by counsel for Carey. This additional assignment of error is without merit for the reason that the trial judge sustained Ryan's objections to that question.
 
 
 9
 In summary, we are of the opinion that the judgments of the trial court should be in all respects affirmed. See James v. Sea-Land Service, Inc., 5 Cir. 1972, 456 F.2d 221, involving injuries from inhaling carbon monoxide to a longshoreman at the same port (Mobile, Alabama), the same stevedore (Ryan), at a time less than a year earlier (June 25, 1968 as opposed to May 3, 1969 here).
 
 
 10
 Affirmed.
 
 
 
 *
 Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I
 
 
 [1]
 "VENTILATION AND ATMOSPHERIC CONDITIONS
 (a) Ventilation requirements with respect to carbon monoxide:
 (1) (i) When internal combustion engines exhaust into a hole, and intermediate deck, or any other compartment, the employer shall see that tests of the carbon monoxide content of the atmosphere are made with such frequency as is found by tests to be necessary in the type and location of the operation, and under the conditions existing, to insure that dangerous concentrations do not develop. Such tests shall be made in the area in which employees are working, by persons competent in the use of the test equipment and procedure. When operations are located in a deep tank or refrigerated compartment the first test shall be made within one half hour of the time the machine(s) start.
 "(ii) The carbon monoxide content of the atmosphere shall be maintained at not more than fifty parts per million (0.005%) as a time-weighed average, and employees shall be removed from the compartment if the carbon monoxide concentration exceeds one hundred parts per million (0.01%). The term 'time-weighed average' means that for any period of time in which the concentration exceeds fifty parts per million, it shall be maintained at a corresponding amount below fifty parts per million for an equal period of time.
 (iii) When neither natural ventilation nor the vessel's ventilating system, where fitted, is adequate to keep the carbon monoxide concentration within the allowable limits set forth in this paragraph, the employer shall use supplementary means of portable ventilation in such size and number and so arranged as to bring such concentration within such limits before work is resumed."
 
 
 [2]
 The safety regulation was received in evidence without objection at trial, and its violation appears to be undisputed. Such regulations define the appropriate standard of care and failure to observe them renders the vessel unseaworthy irrespective of knowledge or negligence on the part of the shipowner. See recent decisions of this Circuit and other jurisdictions to the effect that the violation of a safety regulation renders the vessel unseaworthy as a matter of law, rendering the shipowner liable in damages for injuries sustained as a proximate result of the breach. Manning v. M/V Sea Road, 5 Cir. 1969, 417 F.2d 603; Phipps v. S.S. Santa Maria, 5 Cir. 1971, 418 F.2d 615; Simmons v. Gulf & South American S. S. Co., E.D.La. 1966, 260 F.Supp. 525, affirmed 5 Cir. 1968, 394 F.2d 504; Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir. 1969, 412 F.2d 1011; Venable v. A/S Det Forenede Dampskibsselskab, 4 Cir. 1968, 399 F.2d 347
 The trial court refused Carey's requested instructions to this effect and charged the jury on the general law as to unseaworthiness only.