**Luke BONURA, Jr., Plaintiff-Appellee, Cross-Appellant,**

v.

**SEA LAND SERVICE, INC., Defendant-Appellant, Cross-Appellee,**

**Atlantic & Gulf Stevedores, Inc., Intervenor.**

**No. 74–1012.**

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1974.

Rehearing and Rehearing En Banc Denied Feb. 13, 1975.

See 512 F.2d 671.

Ralph E. Smith, New Orleans, La., for defendant-appellant, cross-appellee.

Frank J. D'Amico, New Orleans, La., for plaintiff-appellee, cross-appellant.

Bertrand M. Cass, Jr., New Orleans, La. for Atlantic & Gulf Stevedores.

Before GEWIN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Luke Bonura, a longshoreman, was injured aboard S/S *Maiden Creek* when he fell during cargo loading operations at New Orleans in December of 1969. This suit against Sea Land Service, Inc. (Sea Land), the owners of *Maiden Creek*, an action predicated upon both negligence and unseaworthiness of the

vessel, followed. The trial court found as a matter of law that *Maiden Creek* was unseaworthy and that her unseaworthiness caused Bonura's injuries. He therefore directed a verdict of liability against Sea Land and submitted only the issue of damages to the jury. The jury returned a verdict of $175,000 for Bonura. After receiving the verdict the trial court indicated that it intended to grant a new trial unless Bonura would remit $50,000 of the jury's award. Bonura consented, and a final judgment of $125,000 was entered. From this judgment Sea Land has appealed, and Bonura has cross-appealed.

Sea Land contends that the trial court erred (1) in directing a verdict of "liability," (2) in failing to submit to the jury an instruction on the issue of Bonura's purported comparative negligence, and (3) in submitting to the jury an issue of loss of future wages. On his cross-appeal, Bonura maintains that the trial judge abused his discretion in ordering a remittitur. A majority of this Court concludes that the trial court committed no reversible error, and its judgment is, therefore, affirmed.

The district court held that the S/S *Maiden Creek* was unseaworthy as a matter of law. This holding was based upon its conclusion that reasonable men could not differ about whether working conditions aboard at the time of Bonura's accident violated two subsections of the then-current version of the Safety and Health Regulations for Longshoring.[1] Specifically, the trial court believed that there could be no doubt that subsections (b) and (c) of 29 C.F.R. § 1504.32 had been violated.

■ While this Court has held that an inquiry into whether or not a ship is unseaworthy is usually a question to be decided by the trier of fact, Neveaux v. Central Gulf Steamship Corp., 503 F.2d 961 (5th Cir. 1974); Morales v. City of Galveston, 291 F.2d 97, 98 (5th Cir. 1961), aff'd, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962), it has also recognized that violations of the Safety and Health Regulations for Longshoring make a ship unseaworthy as a matter of law. Carey v. Lykes Bros. Steamship Co., 455 F.2d 1192, 1194 fn. 2 (5th Cir. 1972), and cases cited therein. It follows that a trial judge correctly directs a verdict of unseaworthiness when he finds in a particular case that all the facts and inferences point so strongly and overwhelmingly towards a violation of one or more of the sections of those regulations that reasonable men could not disagree that a violation existed. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969).

■ We would hestitate to affirm the trial court solely on its determination that there was without question a violation of subsection (c), since there was some dispute in the evidence as to whether two crews were working at different levels in *Maiden Creek's* hatch. However, a detailed review of all the evidence presented compels the conclusion that Bonura was required to work at a spot—either at the edge of a hatch section or atop piled cargo—which was more than eight feet high and where no

---

[1]. The accident occurred on December 11, 1969. At that time the following section of the Safety and Health Regulations for Longshoring was in effect as 29 C.F.R. § 1504.-32:

§ 1504.32 Stowed cargo and temporary landing platforms

(a) * * *

(b) When an edge of a hatch section or of stowed cargo more than 8 feet high is so exposed that it presents a danger of an employee falling, the edge shall be guarded by a safety net of adequate strength to prevent injury to a falling employee, or by other means providing equal protection under the existing circumstances.

(c) When two gangs are working in the same hatch on different levels, a safety net shall be rigged and securely fastened so as to prevent men or cargo from falling.

29 C.F.R. (Labor) has been modified since 1969, but this section has remained unchanged. It is, however, now 29 C.F.R. § 1918.32.

protective safety net had been rigged.[2] Since the failure to provide a safety net under such circumstances is a clear violation of subsection (b), the *Maiden Creek* was unseaworthy.

■ See Land complains that it was entitled to a jury instruction on the issue of Bonura's purported comparative negligence. A majority of this Court, however, is in agreement with the district court that no evidence was presented which would, even construed most favorably to Sea Land, indicate comparative negligence on the part of Mr. Bonura. Even if there was evidence of comparative negligence it would have been confusing, as well as erroneous, for the trial court to have submitted an instruction on that subject to the jury. Urti v. Transport Commercial Corp., 479 F.2d 766 (5th Cir. 1973).

Sea Land's final contention on appeal is that the trial court erred in submitting to the jury the issue of loss of future wages. The issue should not have been submitted, according to Sea Land, for two reasons. First, Sea Land argues, there was no evidence that Bonurs would lose wages in the future. Second, Sea Land continues more specifically, the jury was given no guidance by way of expert testimony which would enable it to estimate rationally the present value of Bonura's loss of future wages, if any. This is so, according to Sea Land, because there was no evidence concerning his work life expectancy, nor was there any actuarial evidence concerning the possible value of Bonura's loss or the accepted mathematical methods, including the use of realistic interest rates, of reducing gross loss to present value. Sea Land does not complain of the substance of the trial court's instruction itself.

■ As to Sea Land's first contention concerning loss of future wages, there is a simple answer. Although Bonura was working as a longshoreman at the time of trial, there was adequate evidence upon which to base the submission of an instruction on loss of wage earning capacity. There is no doubt that Bonura suffered a significant hearing loss in certain frequency ranges. There was also testimony that his fall affected his sense of balance. Both of these infirmities can reasonably be assumed to have the effect of making Luke Bonura a less desirable longshoreman. In addition, Mr. Bonura testified that since the accident there had been days on which a pain in his neck and back prevented him from reporting to work.

■■ Sea Land's second contention on the future loss of wages issue presents more difficulty. The Third Circuit has held that, " . . . once evidence is presented and recovery is sought for future lost earnings, the jury is entitled to receive evidence and appropriate mathematical guidance on the method of reducing lost future earnings to present worth, if they are to act rationally and 'not upon mere conjecture and guess.'" Ballantine v. Central Railroad of New Jersey, 460 F.2d 540, 544 (3rd Cir.), cert. denied, 409 U.S. 879, 93 S.Ct. 133, 34 L.Ed.2d 133 (1972). *See also* Russell v. City of Wildwood, 428 F.2d 1176 (3rd Cir. 1970) and Haddigan v. Harkins, 441 F.2d 844 (3rd Cir. 1970). However, the Third Circuit seems to stand alone in making either expert, actuarial evidence concerning the present value of future loss or mathematical guidance on the method of reducing gross loss to present value prerequisite to the submission of loss of future

---

2. There was some dispute as to exactly how far Bonura fell, but each witness called testified that he fell *at least* eight feet. The only evidence presented which would indicate that Mr. Bonura fell less than eight feet is a statement found in a medical report which relates that Bonura, in recounting the history of his accident to a doctor just after he regained conciousness at the hospital, said that he fell about six feet. In light of the overwhelming evidence that Mr. Bonura in fact fell more than eight feet the existence of the medical report did not require the trial court to submit the issue of liability to the jury. Boeing v. Shipman, *supra.*

wages to the jury. The Sixth, Seventh and Eighth Circuits have all rejected this approach. They have not conceded that "the application of the present worth rule is . . . beyond the understanding and capabilities of most lay persons serving on juries," *Ballantine, supra,* 460 F.2d at 543, but, rather, have presumed that jurors are capable enough and aware enough of modern economics to be able to reduce gross loss to present value intelligently once they have been instructed to perform this function. Heater v. Chesapeake and Ohio Railway Co., 497 F.2d 1243, 1249 (7th Cir. 1974); Duncan v. St. Louis-San Francisco Ry. Co., 480 F.2d 79, 87 (8th Cir.), cert. denied, 414 U.S. 859, 94 S.Ct. 69, 39 L.Ed.2d 109 (1973); Baynum v. Chesapeake and Ohio Ry. Co., 456 F.2d 658, 660–661 (6th Cir. 1972); Pennsylvania Railroad Co. v. McKinley, 288 F.2d 262, 265 (6th Cir. 1961). Believing as we do in the ability of the modern American jury, we align ourselves with the majority of the circuits which have spoken on this question. We hasten to note, however, that we believe that it is decidedly the better practice to present the jury with either expert mathematical testimony or actuarial tables to aid it in its task of reducing gross future lost earnings to their present value. Nothing in our opinion should be read as discouraging attorneys or the court from affording the jury as much guidance in this respect as is reasonable. We hold only that such actuarial and mathematical evidence is not an absolute prerequisite to the submission of an instruction on lost future wages when evidence of such a loss has been presented.

 Bonura on his cross-appeal complains of the $50,000 remittitur which he consented to under protest as the price for the trial court's denial of Sea Land's motion for a new trial. It has long been the rule, and there can scarcely be any doubt at this late date, that a federal district court has the power to condition the denial of a motion for a new trial upon consent to a remittitur. Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935). This Court has held that the ordering of a remittitur under such circumstances is subject to appellate review in spite of the fact that it has been consented to, provided that the consent was given under protest. United States v. 1160.96 Acres of Land, 432 F.2d 910, 912 (5th Cir. 1970); Steinberg v. Indemnity Insurance Co. of North America, 364 F.2d 266, 268 (5th Cir. 1966).[3] The standard for review, however, is strict; and the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge. Gorsalitz v. Olin Mathieson Chemical Corp., 456 F.2d 180 (5th Cir.), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *Steinberg, supra;* Delta Engineering Corp. v. Scott, 322 F.2d 11 (5th Cir. 1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964). The reason for this strict standard is that the court's power to condition a denial of a new trial upon consent to a remittitur is founded upon its power to grant a new trial for excessiveness of verdict. This latter power is, itself, reviewable only for a grave abuse of discretion. Brents v. Freeman's Oil Field Service, Inc., 448 F.2d 601 (5th Cir. 1971); Tucker v. Bethlehem Steel Corp., 445 F.2d 390 (5th Cir. 1971). See Manning v. Altec, Inc., 488 F.2d 127, 130–133 (6th Cir. 1973). A district judge's discretion as to remittitur is circumscribed by the Seventh Amendment: He must not substitute his judgment of damages for that of the jury. We have, therefore, held that the trial court may not require remission of a sum which would reduce the verdict below the *maximum* award which is reasonably supported by the evidence. Jenkins v. Aquatic Contractors & Engineers, 446 F.2d 520, 522 (5th Cir. 1971); Gorsalitz v. Olin Mathieson

---

3. Other circuits disagree with us on the appealability of remittiturs. See generally 9 J. Moore, Federal Practice ¶ 203.06, at 721–722 (2d ed. 1973) and cases cited therein.

Chemical Corp., 429 F.2d 1033, 1046–1047 (5th Cir. 1970), modified, 456 F.2d 180, cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972). In examining the problem of the validity of a suggested remittitur, however, the first question is not whether the amount remitted is correct. Rather, the first question is whether the trial judge abused his discretion in ordering any remittitur at all. In answering this question, an appellate court will find an abuse of discretion only when it appears that the jury's original verdict was *clearly within* the universe of possible awards which are supported by the evidence. Manning v. Altec, Inc., *supra*. If the jury's verdict is not clearly within this ambit, then the trial court has not abused its discretion in demanding *some* remittitur in return for the denial of a motion for a new trial. Once it has been determined that the trial court has not abused its discretion in demanding some remittitur, then the appellate court must determine whether the amount of the award which remains after the remittitur reflects the maximum award which the evidence will support or whether it merely represents the trial court's opinion of what the proper award should have been. At this point deference will be given to the trial court's determination since he, and not the appellate court, was present during the ebb and flow of the trial, and it will be presumed that the amount which he has chosen is the amount which will reduce the jury's verdict to the "maximum possible" award unless the party opposed to the remittitur can point to credible evidence which would support a greater recovery.

 In the case before us for decision we have determined, after a review of the evidence, that under these standards the trial court did not abuse its discretion in requiring a remittitur. Nor have we found credible evidence which would support an award of more than $125,000.

Affirmed.

GEE, Circuit Judge (dissenting):

I respectfully dissent from that portion of the majority opinion which holds Sea Land was correctly denied an instruction on Bonura's comparative negligence. While I agree wholeheartedly with the holding of Urti v. Transport Commercial Corp., 479 F.2d 766 (5th Cir. 1973) that a comparative negligence issue should not be submitted when there is a complete absence of evidence of negligence on the part of an injured party, I do not feel that that case governs the case under consideration. Urti is a classic "no-evidence" case; [4] here, by

---

4. The facts in *Urti* are as follows:

On November 15, 1966, while aboard the S.S. Tamara Guilden in the port of Haifa, Israel, Angel Urti, the plaintiff, was ordered to paint draft numbers on the stern of the vessel. He was lowered over the side of the vessel in a pontoon. The bosun, operating the winch, lowered the pontoon at Urti's signal. To bring himself closer to the vessel, Urti used a two-inch breasting line which was attached to both the pontoon and to a pad-eye, a U-bolt, attached to the side of the vessel. The pontoon was supported by four one-inch wire lines attached to a bridle or ring which was in turn attached to the winch. The bosun told the plaintiff that he would slacken the wire lines, thus shifting more weight to the breasting line and causing it to become taut. This would naturally pull Urti closer to the ship. As the pontoon was being lowered in this fashion, the manila breasting line broke causing a shift in the position of the pontoon. The plaintiff fell forward striking his forearm and shoulder against the metal bridle or one of the wire cables. *Urti* at 768.

Mr. Urti had not selected, provided or rigged any of the equipment used. Neither he nor the bosun had noticed any visible defects in the manila line. Although the job which he was assigned to perform was usually done by two men, there was no reason to assume that Urti knew or had reason to know that his working alone created any undue hazard. There was no evidence that Mr. Urti gave improper instructions to the bosun which *might have caused excessive strain on the* breasting line. In short, although it turned out that Urti was working under what proved to be unsafe conditions, there was no

contrast, there was ample evidence to support a finding of some negligence on the part of Bonura.

According to his own testimony, Mr. Bonura was aware before he fell of the fact that he was working in an area where safety nets should have been rigged. He was also aware of the fact that they had not been rigged. Since he was an experienced longshoreman, a jury could reasonably have concluded that he must have known or, at least, should have known that the absence of the safety nets made his working conditions much more hazardous than they would have been had a net been properly rigged. Yet it is undisputed that Bonura neither ceased working nor demanded or even requested that a net be rigged to protect him from falling.

This Court has held that the fact that there has been a violation of the Safety and Health Regulations for Longshoring even a flagrant one, does not preclude a shipowner from benefiting from the doctrine of comparative negligence. Denenea v. Shipping Enterprise Corp., 486 F.2d 549 (5th Cir. 1973); Denny v. Jugoslavenska Oceanska Plov., Kotor Yugoslavia, 455 F.2d 1277 (5th Cir. 1972); Phipps v. S/S Santa Maria, 418 F.2d 615 (5th Cir. 1969); Manning v. M/V Sea Road, 417 F.2d 603 (5th Cir. 1969). We have held further that working in an area made unsafe by a violation of the regulations can itself be negligence, if the worker has knowledge of the violation and of the dangerous condition which it has created. See, e. g., Phipps v. Santa Maria, *supra,* 418 F.2d at 616; Denenea v. Shipping Enterprise Corp., *supra,* 486 F.2d at 550. Moreover, it is generally accepted that the failure to inform superiors of unseaworthy condi-

tions so that these conditions might be corrected can, also, under certain circumstances, be considered negligence. Mroz v. Dravo Corp., 429 F.2d 1156, 1164 (3rd Cir. 1970); DuBose v. Matson Navigation Co., 403 F.2d 875 (9th Cir. 1968); *see also* Rivera v. Rederi A/B Nordstjernan, 456 F.2d 970 (1st Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972). But see Rivera v. Farrell Lines, Inc., 474 F.2d 255 (2nd Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973) which would restrict this doctrine to unsafe conditions which are not open and obvious.

Given the state of the law as outlined above, I believe that there was a plain jury question as to Bonura's comparative negligence. Specifically, I believe that the jury should have been allowed to decide whether, considering all the facts of this case, a reasonable man with Bonura's experience in longshoring would have continued to work without a safety net having been rigged or would have failed to inform his superiors of the known hazard and demanded, or at least requested, that it be eliminated. It is ironic that the same want of a net, a want equally apparent to both sides, should be held at once to inculpate the defendant and exculpate the plaintiff— both beyond the possibility of reasonable disagreement. Bonura admits that he knew the net should have been there but was not. The condition obviously was dangerous. Our holding, and that below, requires a determination that reasonable men could not differ whether his continuing to work under these conditions, without so much as a request that mandated precautions for his own safety known to him be observed, was prudent. I cannot do so.

evidence that he helped to create the conditions or that he was aware of the potential hazards and ignored them. He was simply

doing a job which he was ordered to do. He had no reason to question the appropriateness of his orders.