Edna Alexander GLEASON, as Natural Tutrix of the minor, Kevin L. Gleason, Plaintiff-Appellant-Cross Appellee,

v.

Thomas L. HALL, Defendant-Third Party Defendant-Appellee-Cross Appellant,

Southern Pacific Transportation Company, Defendant-Third Party Plaintiff-Appellee-Cross Appellant,

Travelers Indemnity Company, Third Party Defendant.

No. 75–2528.

United States Court of Appeals, Fifth Circuit.

July 11, 1977.

Opinion Withdrawn Aug. 5, 1977. See 557 F.2d 1052.

Billy R. Pesnell, Shreveport, La., for Edna A. Gleason.

Henry A. Politz, Fred H. Sutherland, Shreveport, La., for T. L. Hall.

Sam A. Freyer, Shreveport, La., for Southern Pac. Trans. Co.

Jerold L. Perlman, Shreveport, La., for Travelers Indem. Co.

Before WISDOM and GEE, Circuit Judges, and BOOTLE,* District Judge.

WISDOM, Circuit Judge:

The issues on appeal in this case stem from the district court's order of remittitur. The plaintiff challenges the remittitur; the defendants contend that the size of the remittitur is inadequate. The defendants do not contest the finding of liability by the jury.

This diversity action was brought by Edna A. Gleason, as tutrix of her minor son, Kevin Gleason, against Thomas Hall, the conductor of the freight train involved in the incident, and his employer, the Southern Pacific Transportation Company, to recover damages for personal injuries sustained by Kevin as a result of the defendants' negligence. After a trial on November 18 and 19, 1974, the case was submitted to a six-person jury under special interrogatories. The jury returned a unanimous verdict in favor of the plaintiff against both defendants for the sum of $85,000.

The trial judge denied the Southern Pacific's motion for a judgment notwithstanding the verdict. The court took the defendants' motions for a remittitur and a new trial under advisement. In a written opinion the court explained its decision to condition its denial of the new trial motion on the filing of a remittitur of $40,185.81 by the plaintiff. The plaintiff filed the remittitur under protest and appeals from the court's order of May 7, 1975. The defendants cross appeal on the ground of the insufficiency of the remittitur.

On July 1, 1972, Kevin Gleason, aged thirteen, was playing with a friend near the east side of the Southern Pacific's railroad tracks in the southern part of the City of Shreveport, Louisiana. As a freight train passed, the boys threw rocks at it. The conductor, Thomas L. Hall, knew that the trains were being vandalized in that same area by youths throwing rocks or using more dangerous weapons and that some railroad employees had been seriously injured as a result. Hall responded to the rock-throwing by firing shots from a .22 caliber pistol out of a caboose window allegedly in an attempt to scare-off Kevin and his friend. Slack action of the train caused the shots to be diverted toward Kevin who was hit a number of times in the face, chest, and hand by the pellets. Two of the pin-sized pellets, commonly referred to as "rat shot", penetrated his right eye.

Most of the wounds were superficial, but the gunshot seriously injured Kevin's right eye. The pellets entered the eye through the conjunctivia; passed through the cornea, the lens at its margin, the vitreous, and the retina; and came to rest on the ora. The penetration of the gunshot into the eye caused hemorrhaging in the anterior chamber and the vitreous as well as a leakage of the vitreous. Dr. Louis A. Breffeilh performed emergency surgery on Kevin's eye the night of the accident. The surgeon first attempted to irrigate the hemorrhage from the anterior chamber and then to remove the pellets by use of a magnet. Neither procedure was successful, so Dr. Bref-

*Senior District Judge of the Middle District of Georgia, sitting by designation.

feilh sutured the lacerated sclera and the dissected conjunctivia. He then applied laser beams to the wound to seal the pellets into place in the eye.

Kevin remained in the hospital, confined to his bed, until July 20, 1972. During that time his eyes were bandaged, and he was given pinhole goggles to wear permitting him to see in only one direction and preventing movement of his eyes. Following his discharge from the hospital, Kevin returned home but was restricted from his usual activities, including bicycling and playing the trombone in the school band. He returned to school in November, having missed the last of summer school and the first nine weeks of the fall term. The severe restrictions on Kevin's activities continued until May 31, 1973. Dr. Breffeilh has recommended that Kevin continue to refrain from contact sports, such as football, basketball, and baseball. Dr. Alice McPherson, the specialist to whom Kevin was referred by Dr. Breffeilh, however, suggested that Kevin need refrain only from boxing, high diving, and professional football in the future.

Because of the dangers associated with an attempt to remove the pellets from Kevin's eye, Dr. Breffeilh concluded that it was safer to leave the gunshot in the eye, locked into place with a laser beam. Both Dr. Breffeilh and Dr. McPherson stated that there was very little chance the two pin-sized pellets would move. They also testified that because the pellets are lead, one of the most inert metals, there is no likelihood of a chemical reaction between the "foreign bodies" and the tissues of the eye. Dr. McPherson observed that wrinkling in the lens and capsule of Kevin's eye had developed as a result of the penetration of the pellets into the eye.

Dr. Breffeilh testified that his prognosis about Kevin's eye condition includes three possible complications: cataracts on the lens of the eye, a detached retina, and sympathetic ophthalmia. Dr. McPherson confirmed that there is an increased danger that a cataract will develop as a result of the penetration of the eye by the pellets

and the resulting scar tissue. She also testified that there was at the time of her last examination no evidence of cataract development. With a new surgical procedure known as phacoemulcification, Dr. McPherson estimated the likelihood that a cataract could be successfully removed from the lens of Kevin's eye was from ninety to ninety-five percent. Dr. Breffeilh testified that he did not agree with those figures but did not indicate how high he would estimate the rate of success.

Both ophthalmologists testified that the development of a cataract on Kevin's eye will increase the likelihood that the retina will detach. Dr. McPherson suggested that the possibility of a detached retina is "very minimal", "not probable"; Dr. Breffeilh concluded there is a "damn good chance".

A third possible complication resulting from the eye injury is sympathetic ophthalmia. Dr. Breffeilh identified the condition as an inflammatory reaction resulting from a wound to one eye that affects the functioning of the good eye. Such a sympathetic reaction in the uninjured eye can lead to blindness. Dr. McPherson testified that such a reaction is "very rare", "it's one out of many thousands and thousands and thousands of cases". Dr. Breffeilh rejected those statistics but agreed that the likelihood that sympathetic ophthalmia will develop is "remote".

The injury to Kevin's eye caused no disfigurement. Dr. McPherson concluded that even with cataract surgery, there would be no more than fifteen percent disability to the eye over the long term. Dr. Breffeilh testified that prior to the accident Kevin's visual acuity was 20/60, as a result of a preexisting myopic condition, and 20/20 corrected. Two years after the accident his corrected and uncorrected vision had returned to 20/20 and 20/60, respectively. According to the record, the injury to Kevin's right eye will not result in an augmentation of the myopia. Dr. McPherson testified that Kevin has made an "amazingly good" recovery.

Kevin's stipulated medical expenses, including travel costs, were $3,614.19. Both

physicians recommended future monitoring of the eye condition by periodic medical examinations for six to ten years.

# I.

## REMITTITUR

■ This Court recently established the scope of appellate review of a trial court's order of remittitur in *Bonura v. Sea Land Service, Inc.*, 5 Cir. 1974, 505 F.2d 665, in an opinion by Judge Gee:

> The standard for review . . . is strict; and the trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge.

505 F.2d at 669. For an appellate court to find an abuse of discretion, it must appear that the jury's verdict was "*clearly within the universe of possible awards which are supported by the evidence*". (emphasis in original). *Id.* at 670. *See also Gorsalitz v. Olin Mathieson Chemical Corp.*, 5 Cir. 1970, 429 F.2d 1033; *Taylor v. Washington Terminal Company*, 1969, 133 U.S.App.D.C. 110, 409 F.2d 145, 147–49, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85.

■ If the reviewing court concludes that the trial judge did not abuse his discretion in ordering some remittitur, the next question is

> whether the amount of the award which remains after the remittitur reflects the maximum award which the evidence will support or whether it merely represents the trial court's opinion of what the proper award should have been.

*Bonura v. Sea Land Service, Inc., supra*, 505 F.2d at 670. An appellate court must defer to the trial court's determination, and it will be assumed that the amount remaining after the remittitur reflects the maximum possible award "unless the party opposed to the remittitur can point to credible evidence which would support a greater recovery". *Id.*

Under the *Bonura* standards we must answer two questions in determining the propriety of the remittitur award in this case. First, did the trial court abuse its discretion in requiring some remittitur? Second, if not, did the court's determination of the size of the remittitur reflect the maximum possible award the jury could have made on the record before it?

## A. PROPRIETY OF THE REMITTITUR

■ As to the first question, we conclude that the district judge did not abuse his discretion in ordering a remittitur. The trial court concluded:

> In examining the evidence in the case tried before this Court, I find that the verdict is not supported by the evidence and, moreover, reflects a punitive award. (footnote omitted)

As to the first finding, that the evidence failed to support the amount of damages awarded by the jury, we cannot say that "the jury's original verdict was *clearly within* the universe of possible awards which are supported by the evidence." *Bonura v. Sea Land Service, Inc., supra*, 505 F.2d at 670.

The evidence of "hard damages" yields a total of approximately $3600 for past medical expenses. Thus over $81,000, or ninety-six percent of the award, must be assigned to the more speculative damage elements of past and future pain and suffering and loss of future earning capacity. *Howell v. Marmpegaso Compania Naviera*, 5 Cir. 1976, 536 F.2d 1032, 1034. We cannot say the record clearly supports such an amount. The plaintiff-appellant, however, contends that the trial court failed to take account of three factors in assessing the jury's verdict. First, the jury could reasonably conclude from Dr. Breffeilh's testimony that a cataract would develop as a result of the injury, that the retina would become detached, and that the injury would ultimately result in substantial impairment of vision in the injured eye. Second, the jury could reasonably take into account the preexisting myopia refractive error in judging the impact of the injury on Kevin. Third, the jury could conclude that the continued presence of lead pellets in Kevin's eye could create a risk of disability, perhaps from sympathetic

ophthalmia. To the contrary, the district judge's memorandum opinion reveals that he gave careful consideration to the evidence of possible complications as a result of the injury to Kevin's eye. He concluded that the amount of damages awarded for such factors was excessive. The court's specific findings are discussed in greater detail in section I.B.

We defer to the trial court's second finding that the size of the award reflected its punitive nature [1] because he had the benefit of participating in the trial and observing the jury's reactions to the events that transpired.

The trial judge concluded that a note sent to him by the jury foreman just before the verdict was returned suggested the jury's desire to punish the Southern Pacific for failing to control the vandalism and to protect the train crews.[2] In addition, other evidence reveals that early in its deliberations the jury asked the court if it could find the Southern Pacific negligent without also resolving the liability issue against the conductor.[3] The judge responded negatively. The plaintiff contends that this incident discloses the nonpunitive nature of the $85,000 award, because the jury found both the railroad and the conductor negligent in conformance with the court's instructions. We disagree. This early note reveals the jury's desire to punish the Southern Pacific, and the other one suggests its determination that the company pay "any and all damages". We cannot conclude that the district court was clearly erroneous, or abused its discretion, in finding that the verdict reflects a punitive amount. *See Edwards v.*

*Sears, Roebuck and Co.,* 5 Cir. 1975, 512 F.2d 276, 281; *Gorsalitz v. Olin Mathiesen Chemical Corp.,* 5 Cir. 1970, 429 F.2d 1033, 1046, *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807, *reh. denied,* 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 159.

## B. THE MAXIMUM RECOVERY RULE APPLIED TO THIS CASE

■ The second question asked by *Bonura* relates to the size of the remittitur ordered by the court. The "maximum recovery rule" requires that we ask whether the amount of the award reflects the maximum award the jury could have made on the record before it *Bonura v. Sea Land Service, Inc., supra,* 505 F.2d at 670. *See Gorsalitz v. Olin Mathiesen Chemical Corp., supra,* 429 F.2d at 1047, adopting the reasoning and approach of Judge Rubin in *Glazer v. Glazer,* E.D.La.1968, 278 F.Supp. 476, 478–82. Once again, the trial judge's determinations deserve deference because "he, and not the appellate court, was present during the ebb and flow of the trial". *Bonura v. Sea Land Service, Inc., supra,* 505 F.2d at 670.

■ In this case, as in *Gorsalitz v. Olin Mathiesen Chemical Corporation,* 5 Cir. 1972, 456 F.2d 180, 181, *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807, *reh. denied,* 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 159:

The record does not support any inference that the court reached into the air for a figure or proceeded by hunch or intuition. Rather it shows that he considered one by one the several elements

---

1. The plaintiff does not contest the proposition that punitive damages are not recoverable for a tort in Louisiana. *See Layne Louisiana Co. v. Superior Oil Co.,* 1946, 209 La. 1014, 26 So.2d 20, 21–22; *Breaux v. Simon,* 1958, 235 La. 453, 104 So.2d 168, 170.

2. The note stated:
   Since the Southern Pacific Railroad had prior knowledge of vandalism in that area, we strongly feel that this company was definitely negligent in not providing police protection or otherwise correcting this situation before this incidence [*sic*] occurred and we feel that

the railroad company is at fault and should pay for any and all damages incurred by Kevin Gleason in the amount of _____.
   Barbara Vest Parr
      Foreman
   November 19, 1974

3. The jury asked:
   Can Southern Pacific Transportation Co. be held liable for the *entire* and *complete* amount of damages relieving Mr. Hall from *any* prior or future damages?
   (emphasis in original)

of damages and with respect to each element made a finding of the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory for appellant's loss.

As to future medical expenses, the trial court recognized that Kevin's corrected vision is 20/20, as it was before the accident. In his evaluation of the evidence, the district judge concentrated on the more pessimistic testimony of Dr. Breffeilh, whom the jury was entitled to believe. The court accepted the possibility of future surgery for cataracts and a detached retina and concluded that the maximum possible award is $10,000. For twelve periodic examinations by eye specialists in the future he determined the award should not exceed $400 with an additional $800 allowance for travel expenses. The court found that past and future medical expenses should not exceed a maximum award of $14,814.10.

As to mental and physical pain and suffering, the district court recognized the pain associated with Kevin's eye injury as well as with past and future surgery and Kevin's mental anguish resulting from the injury. The court determined that the maximum possible award for pain and suffering is $15,000.

As to physical disability and impairment of future earning capacity, the court found, in accordance with the medical testimony, that Kevin is at present disabled to a minimum extent by the injury. The trial judge recognized Dr. Breffeilh's recommendation that Kevin refrain from participating in contact sports and noted that Kevin cannot pursue a career as a professional football player or as a military serviceman. He decided that the award for disability and impaired future earning capacity must be small because of the lack of evidence of Kevin's career preferences before the accident and because of the number and variety of vocations still open to him. The court noted that a jury could award damages for periods of total disability, while Kevin was recovering from his injury and the accom-

panying surgery and during the recovery periods for future surgery. As the court noted, Kevin suffered no disfigurement from the injury and there was no evidence of any embarrassment to him as a result of the injury. The trial judge determined that the maximum possible award for physical disability and damage to future earning capacity is $15,000.

According to the trial judge, the maximum possible recovery permitted by the evidence is $44,814.10. The court's conscientious and detailed attempt to determine the maximum award for each element of damages and our examination of the record convinces us that the trial judge did not abuse his discretion in ordering a remittitur of $40,185.81. We conclude that the plaintiff-appellant cannot point to "credible evidence which would support a greater recovery", as required by *Bonura*. *Bonura v. Sea Land Service, Inc., supra*, 505 F.2d at 670. The district court evidently decided that the jury could not properly award damages for the effect of the injury on Kevin's preexisting myopia or for the risk of sympathetic ophthalmia. Dr. Breffeilh testified that myopia is very common and that Kevin's myopic condition is not related to the injury. He also stated that the risk of sympathetic ophthalmia is "remote". Dr. McPherson testified to an even slimmer possibility that sympathetic ophthalmia will develop; she characterized the condition as "very rare", "one out of many thousands and thousands and thousands of cases". We are satisfied that the amount remaining after the remittitur ordered by the district court reflects the maximum possible award a jury of reasonable persons could have made in this case.

## II.

### ADEQUACY OF THE REMITTITUR

■ On cross-appeal the defendants contend that the district court erred in not requiring a larger remittitur by the plaintiff. They argue that favorable comments made by the district judge about the plain-

tiff's witness, Dr. Breffeilh, persuaded the jury to give more weight to his testimony than to Dr. McPherson's.[4] This argument must fail for three reasons: untimeliness, lack of prejudice, and irrelevance.

First, the defendants did not object to either comment in the trial court nor did they ask the district judge to clarify his remarks. In addition, in filing their post-trial motions the defendants failed to present this claim of error to the district judge for his consideration. As to issues not presented to the trial judge, the rule in this Circuit is clear:

> In the absence of exceptional circumstances where a miscarriage of justice would result, a condition not present here, questions that were not presented to or passed on by the trial court will not be considered on appeal.

*D. H. Overmyer Co. v. Loflin,* 5 Cir. 1971, 440 F.2d 1213, 1215, *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90. *See also Dennis v. Central Gulf Steamship Corp.,* 5 Cir. 1972, 453 F.2d 137, 141, *cert. denied,* 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218. No miscarriage of justice will result from our refusal to entertain the defendants claim on appeal.

In any event, we hold that there is no merit to the contention that the remittitur was inadequate. The remarks were not prejudicial to the defendants; indeed, the second comment was favorable to their position. Further, the defendants' argument that the remarks caused the jury to place too much weight on Dr. Breffeilh's testimony is irrelevant to the issue of how large the remittitur should be. As required by *Bonura,* the district court determined the size of the remittitur by calculating the maximum award the jury could have made on the record. That maximum amount has no relationship to how much weight the jury actually gave Dr. Breffeilh's testimony. What weight the jurors *could* have given such testimony is the critical issue, and the judge properly evaluated the evidence on damages by giving decisive weight to the more pessimistic prognosis. We therefore reject the defendants' contention that the remittitur was inadequate.

AFFIRMED.

---

4. The two remarks about which the defendants complain are set out below in context:

a. "THE COURT:

. . . . .

"Mr. Pesnell, Mr. Freyer and Mr. Politz, is there any question but that this record should indicate that Dr. Breffeilh is, indeed, qualified as an expert witness in matters concerning the human eye?

"MR. FREYER: We would be happy to stipulate his qualification.

"MR. POLITZ: We would also join in that stipulation.

"THE COURT: I would say to the ladies and gentlemen of the jury if there is an expert medical doctor dealing with the diseases and problems of the human eye, if I know one his name is Louis A. Breffeilh.

"Normally the attorneys go through a big chain of questions as to where is the doctor educated, et cetra.

"Dr. Breffeilh, how long have you been practicing medicine?"

. . . . .

b. "Q Would you say that it [sympathetic ophthalmia] is remote, Doctor, the possibility of this occurring?

"A Yes, it is remote.

"I guess that since I have been practicing in the many years that I have only seen about eight cases of it. And in the last ten years there have been only two of my own.

"THE COURT: Out of how many patients, Doctor?

"WITNESS BREFFEILH: Your Honor, that would be kind of hard to say. I don't know how many patients.

"THE COURT: If anyone has ever waited in your office they would know what you are talking about. There are many persons."