**Mrs. Christine KEYES, Wife of/and Thomas Keyes, Plaintiffs–Appellees,**

v.

**Ray LAUGA et al., Defendants–Appellants,**

**Office of Charity Hospital of Louisiana at New Orleans, Intervenor.**

No. 79–1137.

United States Court of Appeals, Fifth Circuit. Unit A

Jan. 26, 1981.

A. W. Wambsgans, Metairie, La., for defendants–appellants.

Minge & Batiza, James H. Minge, New Orleans, La., for plaintiffs–appellees.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

WISDOM, Circuit Judge:

Mrs. Christine Keyes, the appellee, and her husband, Thomas Keyes, brought this action under 42 U.S.C. § 1983 to recover for injuries they suffered, during and after their arrest, at the hands of several deputies of the St. Bernard Parish Sheriff's Department. They joined as defendants Deputies Ray Lauga and Henry Bonds, Sheriff Jack Rowley, and the Department's insurer, North River Insurance Company. During the trial, the district court directed a verdict dismissing all claims against the sheriff and all of Mr. Keyes's claims against the remaining defendants. A jury found for Mrs. Keyes on her remaining claims, concluding that the deputies had unconstitutionally searched and arrested her, had used excessive force in making the arrest, and had beaten her after making the arrest. The jury awarded $75,000 in damages, $37,-500 from each deputy, and defendants now appeal.

I.

At about 5:00 a. m. on September 1, 1977, Deputies Lauga and Bonds appeared at the Keyes's residence in Chalmette in St. Bernard Parish to execute warrants for the arrest of Peter Keyes, Sr. and Peter Keyes, Jr.[1] When Mr. Keyes refused to submit to arrest, Lauga and Bonds called for help. Seeing a large number of deputies arrive with weapons drawn, and fearing for the safety of their children, Mr. and Mrs. Keyes left the house. Mr. Keyes was immediately placed under arrest and put into a police

---

1. Deputies Lauga and Bonds had attempted to execute the warrants on the previous day, but confusion arose concerning the identity of the persons named in the warrants. Mr. Keyes presented the deputies with identification showing his name to be "Thomas", not "Peter", and Mrs. Keyes told the deputies that her husband had a brother named Peter Keyes who lived in California. On the morning of the arrest, Mr. and Mrs. William Burtchaell, the complainants on the warrant, accompanied the deputies to the Keyes's residence and identified Thomas Keyes as one of the persons whose actions prompted them to file their complaint.

car. Told by her husband to call the sheriff, Mrs. Keyes returned to her home to use the telephone.

The events that then ensued are in dispute. The testimony of Mrs. Keyes, which the jury obviously credited, was that Lauga, Bonds and at least one other deputy followed her into the house uninvited. They made a quick search of the premises and, without telling her that she was under arrest, kicked her and beat her with nightsticks. After being subdued she was placed in a police car with her husband, driven to the St. Bernard Parish Jail, and booked on charges of disturbing the peace, assaulting a police officer, and resisting arrest. On the way to jail, and again after she was placed in her cell, Bonds and Lauga again beat her with their fists and nightsticks.[2]

The testimony of Lauga and Bonds differs in every material respect. They gave several reasons for their uninvited entry into the Keyes's home: they had heard a shotgun being "cranked" and feared for their personal safety; they thought that Peter Keyes, Jr., for whom they also had an arrest warrant, might be inside; and they supposedly heard Mrs. Keyes yell, "Ellis, blow their f'ing heads off. Shoot them." They testified that, once inside, they arrested Mrs. Keyes because she was yelling obscenities at them. They denied that they or any deputy ever beat her or used any force other than that necessary to overcome her resistance to the arrest.

## II.

The defendants mount several challenges to the judgment that can be disposed of briefly. They first assert that the court committed reversible error by failing to ask some of their proposed questions on voir dire, by failing to give certain requested jury charges, and by failing to use their proposed interrogatories on the special verdict form used by the jury in reaching its decision.

■ Rulings on the scope of voir dire are committed to the discretion of the trial court and the failure to ask particular questions proposed by the parties is not grounds for reversal absent a showing of error and prejudice. *See Louisville & Nashville R. R. v. Williams*, 5 Cir. 1966, 370 F.2d 839, 841–42 & n.5. In their brief on appeal the defendants do not even specify which of their rejected voir dire questions supply the basis for their claim of error. The transcript of the trial does not include the voir dire examination. We thus have no basis on which to evaluate this asserted error.

■ The defendants' objections both to the judge's instructions and to the special interrogatories are more to their form than to their content. The trial judge has considerable latitude in framing his instructions to the jury as long as he explains adequately all of the claims and theories advanced by both parties. *Andry v. Farrell Lines, Inc.*, 5 Cir. 1973, 478 F.2d 758, 759. Similarly, special interrogatories are unassailable if they adequately present the issues to the jury. *Dreiling v. General Electric Co.*, 5 Cir. 1975, 511 F.2d 768, 774. After reviewing the judge's instructions

2. According to Mrs. Keyes's testimony: Lauga and Bonds struck her with their fists and a "big black stick". When she fell to the floor they kicked her. Her thirteen year old son was present during the incident. Lauga and Bonds then handcuffed Mrs. Keyes and threw her into a police car with her husband, who had already been handcuffed and placed in the back of the vehicle. Lauga and Bonds then drove the car to the St. Bernard Parish jail. They stopped along the way. Lauga got out of the car, opened the rear door, kicked, and villified Mrs. Keyes.

Once at the jailhouse, Officer Lauga first would tell Mrs. Keyes to sit down, then pick up Mrs. Keyes and throw her down into a chair. He would then say, "I told you to stand up," and jerk Mrs. Keyes out of the chair. Upon standing up, Mrs. Keyes would again be ordered to sit down. This continued for some time. She was still handcuffed.

Bonds and Lauga finally led Mrs. Keyes to a cell. On the way to the cell, Bonds held Mrs. Keyes' hands as Lauga hit her on the back of the head with the palm of his hand and insulted her in profane and obscene terms.

Once Mrs. Keyes was placed in the cell, Lauga instructed her to turn around in order that he might remove the handcuffs. Separated from Lauga by the cell bars, Mrs. Keyes backed up against the bars, whereupon Mr. Lauga punched Mrs. Keyes in the back.

and the special verdict form, we conclude that they were sufficient under these standards.

The defendants also contend that the trial court should have granted their motions for directed verdict and judgment n. o. v. on all issues except the issue of their use of excessive force. In reviewing these rulings our inquiry matches the inquiry undertaken by the trial court in passing on both these motions: whether the evidence, viewed in the light most favorable to the nonmoving party, is such that reasonable men could not arrive at a contrary verdict. *Chouinard v. Chouinard*, 5 Cir. 1978, 568 F.2d 430, 433. Mrs. Keyes's testimony, viewed most favorably to her, substantiates every claim for which the defendants were held liable.

The defendants also argue that because this case involved similar issues that could be resolved in a possible state criminal prosecution against the plaintiff, the district court should have abstained from deciding those issues.[3] The abstention doctrine has never been stretched that far. *Younger v. Harris*, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, is not applicable. It holds only that the federal courts will not enjoin the enforcement of an allegedly unconstitutional state criminal statute under which the federal plaintiff is being prosecuted in a pending state criminal proceeding. No such injunctive relief is sought here. *Huffman v. Pursue, Ltd.*, 1975, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, and the other progeny of *Younger* are likewise inapplicable. *See* Note, *Limiting the Younger Doctrine: A Critique and Proposal*, 67 Cal.L.Rev. 1318, 1323–28 (1979); *Developments in the Law–Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1301–22 (1977). Nor does this case fall within any of the other abstention doctrines. *See generally Colorado River Water Conservation District v. United States*, 1976, 424 U.S. 800,

96 S.Ct. 1236, 47 L.Ed.2d 483; C. Wright, Law of Federal Courts § 52 (3d ed. 1976).

The defendants seek attorney's fees under 42 U.S.C. § 1988 with respect to those claims disposed of in their favor by directed verdict. Section 1988 provides for attorney's fees at the court's discretion to prevailing parties in suits brought under certain of the civil rights laws, including 42 U.S.C. § 1983. Relying on the legislative history of § 1988, this Circuit has held that prevailing parties are ordinarily entitled to attorney's fees "unless special circumstances would render such an award unjust". *Criterion Club of Albany v. Board of Commissioners*, 5 Cir. 1979, 594 F.2d 118, 120. This liberal allowance of fees was necessary to encourage vigorous private enforcement of the civil rights acts. S.Rep. 94–1011, 94th Cong., 2d Sess. 4–5, *reprinted in* [1976] U.S.Code Cong. & Ad. News, pp. 5908, 5911–12. Congress explicitly recognized, however, that private enforcement would be substantially deterred if parties who had good faith claims under the civil rights statutes faced the prospect of having to pay their opponent's fees should they lose. *Id.* at 5 (citing *Richardson v. Hotel Corporation of America*, E.D.La. 1971, 332 F.Supp. 519, *aff'd*, 5 Cir. 1972, 468 F.2d 951). Thus, Congress contemplated that the unsuccessful civil rights plaintiff could be assessed his opponent's fees only where his suit was "frivolous, vexatious, or brought for harassment purposes". *Id.* In light of Mrs. Keyes's successful prosecution of several of the claims brought in this case, we cannot conclude that the unsuccessful claims, which arose out of the same set of circumstances, were brought in bad faith.

### III.

The first substantial question raised by the defendants concerns the court's refusal to allow two of the defendants' witnesses to

---

**3.** The charges filed against Mrs. Keyes on the night of her arrest were pending at the time of the trial. A few weeks after the trial the charges were dropped. Two of the charges–assault on a police officer and resisting arrest– could raise the issues of unconstitutional search and false arrest, since those are affirmative defenses. *See White v. Morris*, La. 1977, 345 So.2d 461, 465–66; *New Orleans v. Lyons*, La. 1977, 342 So.2d 196, 199; La.Rev.Stat.Ann. § 14:19 (West 1974).

testify. The witnesses were offered in rebuttal to the testimony of Charles Wallace, an inmate at the St. Bernard Parish Jail on the night of Mrs. Keyes's incarceration there. Wallace corroborated Mrs. Keyes's testimony that she was beaten by Deputy Lauga while Lauga and Deputy Bonds were placing her in the cell. Contending that they were surprised by Wallace's testimony, the defendants sought to introduce the testimony of Richard Ford, the assistant jailer, and Carolyn Boudreaux, a part–time matron at the jail. Ford would have testified that he, not Lauga, assisted Bonds in placing Mrs. Keyes in jail. Furthermore, Ford would have testified that Mrs. Keyes was in a cell on the second floor, not on the first floor as Wallace maintained. Boudreaux would have corroborated Ford's testimony by stating that Mrs. Keyes was in a second-- floor cell when Boudreaux removed her for transportation to Charity Hospital. The district judge refused to admit this testimony because the witnesses had not been listed in the pretrial order.

Rule 16 of the Federal Rules of Civil Procedure states that the pretrial order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice". The pretrial order here listed the witnesses for both sides and barred the calling of any unlisted witnesses. The pretrial order permitted no exception to this requirement, but the pretrial notice, on which the pretrial order was closely patterned, provided an exception for "rebuttal witnesses whose necessity could not reasonably be anticipated". Reading Rule 16 together with the pretrial order as augmented by the pretrial notice, the situation here raises two questions: First, did the trial court properly interpret the pretrial order, that is, could the necessity for the two witnesses have been reasonably anticipated? Second, even if· the need for those witnesses could have been anticipated, should the court have allowed them to testify to prevent manifest injustice?

 Questions concerning both the interpretation of pretrial orders and the exclusion of undisclosed witnesses are review-able only for abuse of discretion. *See, e. g.,* *Bornmann v. Great Southwest General Hospital, Inc.,* 5 Cir. 1971, 453 F.2d 616, 625; *Simonsen v. Barlo Plastics Co.,* 1 Cir. 1977, 551 F.2d 469, 471; *Franklin Music Co. v. American Broadcasting Co.,* 3 Cir. 1979, 616 F.2d 528, 539; *Napolitano v. Compania Sud Americana De Vapores,* 2 Cir. 1970, 421 F.2d 382, 384–85. Given that standard, the record furnishes the answer to both questions. From the outset of this action, in her petition for damages, Mrs. Keyes had contended that she was beaten at the jail by Lauga. The defendants were advised well before trial that Charles Wallace would testify on Mrs. Keyes's behalf. Lauga had arrested Wallace himself and both he and Bonds knew that Wallace was in the Parish Jail. The defendants must have known that Wallace's testimony would relate to the treatment Mrs. Keyes received at the jail; there was nothing else Wallace would have been competent to testify about. Even if the defendants were surprised by the particulars of Wallace's testimony, they were to blame, for they could easily have taken his deposition prior to trial to determine the nature of his testimony. The necessity for Ford's and Boudreaux's rebuttal testimony could reasonably have been anticipated.

The rationale supporting our conclusion that the need for the witnesses could have been anticipated also supports the conclusion that the exclusion of those witnesses was not an abuse of discretion. If the defendants knew or should have known that the witnesses were necessary, then the exclusion of those witnesses was not manifestly unjust. In fact, the admission of the two witnesses may well have resulted in manifest injustice to the plaintiffs, for they would not have had time to prepare their own response to those witnesses' testimony. In these circumstances, the trial court did not abuse its discretion by refusing to allow the defendants to ambush the credibility of Wallace's testimony by introducing two surprise witnesses whose credibility could not have been attacked by the plaintiffs.

## IV.

The defendants' final contention is that the verdict was excessive, justifying a new trial or, in the alternative, a remittitur. Our review of this issue is limited to an examination of the plaintiff's injuries to determine whether the damage award is beyond the maximum possible award supported by the evidence in the record. *Cf. Gleason v. Hall*, 5 Cir. 1977, 555 F.2d 514, 519; *Howell v. Marmpegaso Compania Naviera*, 5 Cir. 1976, 536 F.2d 1032, 1034; *Bonura v. Sea Land Service, Inc.*, 5 Cir. 1974, 505 F.2d 665, 669–70. We are also guided by the recent decision in *Carey v. Piphus*, 1978, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252, which states that principles of common law torts govern the recovery of damages in § 1983 actions. *Carey* held that an invasion of a constitutional right must be accompanied by actual injury to be compensable by anything more than nominal damages.

There was no evidence that any property damage occurred during the unconstitutional search, which was actually a cursory check of the house to identify its occupants. Mrs. Keyes suffered the indignity of an intrusion into her home, but this was no more than trespass. The unconstitutional arrest and imprisonment, which lasted about two hours, did not cause any injury other than the embarrassment and mental anguish that may accompany such an occurrence. The excessive force used by Bonds and Lauga did cause personal injuries to Mrs. Keyes, including a low–grade concussion, numbness in her left thumb, some bruises, and allegedly, continuing headaches, nightmares, and nervousness. The residual effect of the ill treatment apparently does not limit her activities. Her past medical expenses totalled $329. Since she is not under medical care, no evidence of future medical costs was introduced.

Aside from her medical bills, no other evidence of monetary loss was introduced. Thus the remainder of the verdict, over $74,000, was directed to the more speculative items of recovery–pain and suffering, mental anguish, and embarrassment because of the trespass and false arrest. The conduct of the defendants undoubtedly caused Mrs. Keyes pain and suffering, and credible evidence established that she suffered emotional reactions such as heightened anxiety and loss of sleep, but the award appears to us to be beyond the maximum possible recovery for those items–according to the evidence in this record. *Cf. Gleason v. Hall*, 555 F.2d at 519; *Howell v. Marmpegaso Compania Naviera*, 536 F.2d at 1034; *Bonura v. Sea Land Service, Inc.*, 505 F.2d at 669–70. We therefore order a conditional remittitur. We leave it to the district court, however, to determine the amount of the remittitur because the district judge, having had the opportunity to observe the trial, is in a better position than we to evaluate the subjective elements of damage suffered by Mrs. Keyes. *Bonura* at 670. In making this determination, the court should be guided by the "maximum recovery rule" announced in this Circuit in *Gorsalitz v. Olin Mathieson Chemical Corp.*, 5 Cir. 1970, 429 F.2d 1033, 1046–47, which adopted the rationale of *Glazer v. Glazer*, E.D.La. 1968, 278 F.Supp. 476, 478–82. If Mrs. Keyes refuses the remittitur thus determined, the trial court shall grant a new trial solely on the issue of damages.

We have considered the appellants' contentions not discussed in this opinion. They are without merit.

We therefore AFFIRM as to liability, REVERSE as to damages, and REMAND for the granting of a remittitur or a new trial at the option of the plaintiff.