**Glen R. HEMINGWAY, (Gretchen Hemingway, substituted as plaintiff-appellant for Glen R. Hemingway, deceased), Plaintiff-Appellant Cross-Appellee,**

v.

**OCHSNER CLINIC and/or Ochsner Foundation Hospital, Defendant-Appellee Cross-Appellant.**

No. 83–3051.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1984.

See also, 5 Cir., 608 F.2d 1040.

Tschirn & Robin, John M. Robin, Darryl J. Tschirn, Covington, La., for plaintiff-appellant cross-appellee.

Adams & Reese, Henry B. Alsobrook, Jr., Jean M. Farquharson, New Orleans, La., for defendant-appellee cross-appellant.

Before GEE and GARWOOD, Circuit Judges, and EAST,* District Judge.

GEE, Circuit Judge:

On several occasions in 1973, doctors at Ochsner Hospital Clinic and Ochsner Foundation Hospital prescribed to Glen Hemingway the drug Cafergot, to which he became hypersensitive. He developed dramatic

* District Judge of the District of Oregon, sitting by designation.

symptoms of hypersensitivity and was treated for these at Ochsner, but some time went by before doctors there realized that his problems were caused by the administration of Cafergot. After a protracted sequence of litigation, the jury found that certain physicians at Ochsner were negligent in their diagnosis and treatment of Mr. Hemingway and awarded him $365,000 damages. Reviewing the verdict and the damage award in light of Louisiana's standard of proof in malpractice actions, the trial court found that the evidence would support the jury verdict as to one specific incident and none other. He determined that the evidence of effects from this incident was limited to a 36-day period and ordered damages reduced to $15,000. Hemingway's widow [1] now appeals the remittitur, contending that the evidence presented justified the jury's award.

We find that the trial judge did not err in pinpointing the specific act that the jury could have found to constitute malpractice under Louisiana law, nor did he err in limiting the period for which the evidence supported finding injury from this act. Despite our sympathy for Mr. Hemingway's suffering, this court may not hold the hospital liable to him for negligence beyond that which he has proved according to the standard prescribed by law.[2]

*Hemingway's Illness and Treatment*

Glen Hemingway was first admitted to Ochsner Clinic in January of 1973, at which time he was diagnosed as suffering from pancreatitis.[3] Operations in January and in April removed his pancreas, rendering him an iatrogenic diabetic. After the operation, Hemingway was seen by Dr. Murison, an endocrinologist at Ochsner Foundation Hospital, for his diabetes.

Hemingway also suffered from migraine headaches, which had plagued him since young manhood. He testified at trial that he had been taking Cafergot, a combination of caffeine and ergotamine, since December of 1971 to obtain relief from his severe migraine symptoms. Dr. Murison continued to prescribe Cafergot for Hemingway's migraine; Hemingway testified at trial that he was using over twelve Cafergot suppositories in two weeks.

Ergotamine is a vasoconstrictant; excessive intake can cause vascular insufficiency and gangrene of the extremities. Ergotamine can also cause gastrointestinal problems. The literature accompanying the drug—introduced into evidence—indicates that Cafergot is contraindicated for patients suffering from certain vascular problems, including hypersensitivity to any of its components and peripheral vascular disease.[4] Dr. Murison testified that diabetics are prone to develop vascular problems, although, he stated, such problems usually take some years to develop.

According to Hemingway's testimony at trial, on June 8th he had a diabetic crisis while moving his motorcycle in his garage and fainted, hitting his head and right arm when he fell. Later that day he developed a migraine headache and took Cafergot for relief. The next morning, his left foot was swollen and painful. On that day he renewed his prescription for Cafergot. Since his foot was worse on June 10th, he went to Ochsner Hospital emergency room where his foot was X-rayed and an Ace bandage applied. In the next few days the foot got progressively worse and Hemingway returned to Ochsner emergency room. On the evening of June 16th, Dr. John Ochsner, a surgeon expert in the fields of cardiovas-

1. Hemingway died during the pendency of this appeal.

2. It is uncontested that Louisiana law applies to this diversity case.

3. More facts of Hemingway's ailments and treatment at Ochsner are given in our previous opinion in this case, reported at 608 F.2d 1040, 1042–46 (1979). While the testimony quoted in that opinion comes from the first of the three

jury trials in this case, the testimony of Dr. Murison quoted therein was submitted to the jury in this last trial by way of deposition since Dr. Murison was unavailable. Thus his earlier testimony, but none other, is properly part of the record on this appeal.

4. Dr. Murison, in his testimony, defined peripheral vascular disease as "a group of diseases in which there are problems dealing with the circulation in the extremities. . . ."

cular and vascular surgery, was called in to treat Hemingway's circulatory problem. Dr. Ochsner testified that when he asked the patient what drugs he was taking Hemingway mentioned three medications but did not mention Cafergot. Dr. Ochsner testified that he does not personally review patients' records, but relies on his staff to consult with physicians on the staff of supervising physicians who have been treating the patient and to relay pertinent information to him. The medical records show that a physician on Dr. Ochsner's staff did consult with one on Dr. Murison's staff. Dr. Ochsner testified, however, that he was not made aware in June that Cafergot had been prescribed to Hemingway. When medication failed to dilate the blood vessels in the patient's foot, Dr. Ochsner performed a left lumbar sympathectomy, an operation in which nerves controlling the flow of blood to the leg are severed, allowing the blood to flow without restraint. In a few days the foot improved and Hemingway was discharged.

Hemingway returned to Ochsner on July 7th, suffering from the same symptoms: his left foot was swollen, cold and blue. The physician on Dr. Ochsner's staff who filled out the admission report noted "possible Buerger's disease,"[5] a condition for which Cafergot is specifically contraindicated. Dr. Ochsner's staff performed a continuous epidural block and administered medication to dilate the vessels, with moderate success. On July 9th, Hemingway suffered a migraine headache. Dr. Moseley, a member of Dr. Ochsner's staff, gave the patient a Cafergot suppository for the headache. Almost immediately thereafter, Hemingway's foot became blue again. When the doctors realized that Hemingway had received Cafergot just before the relapse, they diagnosed "ergotamine poisoning" as the cause of his lack of circulation in the left foot. Dr. Ochsner testified to the doctors' conclusions on July 9th:[6]

"Q Oh, then you all knew then that this had to be a relationship between the foot condition and the Cafergot, is that correct?

"A Correct.

"Q Did you conclude at that time, Doctor, that there was a relationship between the foot condition and Cafergot back in June when you did the sympathectomy?

"A Yes, yes."

Hemingway's condition was slowly remedied by continued use of the same medication previously administered to dilate the blood vessels.

Hemingway was discharged on July 14th. He returned to Ochsner Clinic two or three times later in July and August for follow-up treatment of his foot, the last date of such treatment being August 17, 1973. In early September, doctors at Ochsner became concerned that Hemingway had developed an addiction to the codeine that had been prescribed to him as a painkiller. Dr. Murison, Dr. McKinnon (who performed the pancreatectomy) and two other physicians at Ochsner reviewed Hemingway's record. The hospital record of their conference shows that they also discussed Hemingway's ergotamine sensitivity, as to which they came to the following conclusion: "The migraine problem is major since ergotamine sensitivity precludes use of this—which has helped patient in past but also conceivably could have played a role in starting the pancreatitis, i.e., its elements of [these three preceding words crossed out] vasculitis, as initiating this."[7]

Hemingway and his wife testified at this trial to continuing pain and swelling in his left leg and foot and his inability to lead a normal life or to have normal sexual relations. However, the only testimony introduced of the cause of Hemingway's problems after mid-August of 1973 was the ex-

5. Buerger's disease is a severe circulatory disease in which blood clots in the limbs cut off circulation.

6. This testimony was given at the first trial in this case but affirmed by Dr. Ochsner at the instant trial.

7. Vasculitis is a general term for inflammation of the blood vessels, which can be caused by a reaction to drugs.

pert testimony of Dr. Ochsner, who stated that he had examined Hemingway after September of 1973 and that, in his opinion, Hemingway's present problems were due to his diabetes and not in any way to his hypersensitivity to Cafergot.

*The Posture of this Appeal*

This case has been in court for nine and a half years. Hemingway originally filed suit against Doctors Murison and Ochsner and their staffs, Ochsner Hospital and Clinic, and their respective insurance firms on June 14, 1974. The case came to trial in early 1977. At the close of plaintiff's case, the trial court directed a verdict in favor of all defendants. On appeal, we reversed and remanded, *Hemingway v. Ochsner Clinic,* 608 F.2d 1040 (5th Cir.1979). Trial recommended in September of 1981, but after several days a mistrial was declared. Finally, in December 1981, the case was at last tried to a conclusion.

The events of this last trial closely circumscribe our review. During trial, the court granted motions for directed verdict which removed from the jury's consideration the vicarious liability of the hospital and clinic based on the actions of any personnel except Drs. Ochsner and Murison, and doctors on their staffs. Before the case went to the jury, the parties stipulated that the hospital and clinic would be responsible for any negligence of physicians on Dr. Murison's or Dr. Ochsner's staffs. Also, the trial court granted defendants' motions for directed verdict as to future medical expenses, past wage loss, and future earning capacity.

The jury absolved Drs. Murison and Ochsner of liability but found that doctors on their staffs "negligently failed to follow the recognized standard of care in the diagnosis or treatment of Hemingway's condition" and that this negligence was a legal cause of injury to plaintiff. The jury awarded damages of $365,000 against the hospital and clinic, and the court entered judgment based on the jury verdict.

Defendants then filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. In April 1982, the court denied their motion for judgment

n.o.v. and for a new trial on the issue of liability. The court ordered, however, that the damages award be set aside and a new trial held on damages unless the plaintiff filed a remittitur of all damages exceeding $15,000.

The court's order was based on its finding that the sole incident as to which the evidence submitted would, under Louisiana law, support the jury finding of liability on the part of physicians on Dr. Murison's or Dr. Ochsner's staffs was the administration of Cafergot by Dr. Moseley on July 9, 1973 —while Hemingway was being treated for the second time for lack of circulation in his foot. Further, the court found that since Hemingway had not produced evidence of injury from that administration of the drug after the date of his last treatment for his foot at Ochsner on August 17, 1973, the period for which damages for that incident could be awarded covered only those 36-odd days. Applying the standard of this circuit for review of damage awards, enunciated in *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033 (5th Cir.1970), *modified,* 456 F.2d 180 (5th Cir.), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972), the trial court found that the maximum award which the evidence would support was $15,000.

Plaintiff refused to accept the remittitur and the case was set again for trial on the damages issue. At this time Judge Boyle, who had presided over the proceedings, took senior status; and the case was reassigned to Judge McNamara. At a status conference in December of 1982, Judge McNamara stated that in view of Judge Boyle's order the new trial on the damages issue would have to be confined to damages sustained between July 9th and mid-August of 1973. Feeling that appeals would be inevitable, the plaintiff agreed to submit the matter to the court on the previous record. On December 20th, Judge McNamara entered judgment for plaintiff in the amount of $15,000, limiting the damage period to the roughly 36 days specified by Judge Boyle. Plaintiff's subsequent motions to amend this judgment and motion for a new trial were denied by Judge McNamara. Both plaintiff and defendant now appeal.

Plaintiff argues that Judge Boyle erred in granting a conditional remittitur reducing the damage to $15,000 and that Judge McNamara erred in limiting the damage period in the new trial to the 36-odd days and in awarding only $15,000. Defendants appeal Judge Boyle's denial of their motion for judgment n.o.v. or for a new trial on liability.

### Plaintiff's Failure of Proof

■ In *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665 (5th Cir.1974), this court set a strict standard for appellate review of a trial court's order of remittitur: The trial court will be reversed on the issue of whether any remittitur is proper only where the party opposed to the remittitur shows an abuse of discretion by the judge. *Id.* at 669.

[A]n appellate court will find an abuse of discretion only when it appears that the jury's original verdict was *clearly within* the universe of possible awards which are supported by the evidence.... Once it has been determined that the trial court has not abused its discretion in demanding some remittitur, then the appellate court must determine whether the amount of the award which remains after the remittitur reflects the maximum award which the evidence will support or whether it merely represents the trial court's opinion of what the proper award should have been. At this point deference will be given to the trial court's determination since he, and not the appellate court, was present during the ebb and flow of the trial, and it will be presumed that the amount which he has chosen is the amount which will reduce the jury's verdict to the 'maximum possible' award unless the party opposed to the remittitur can point to credible evidence which would support a greater recovery.

*Id.* at 670 (emphasis in original). *Accord, Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). *Gorsalitz*, 429 F.2d at 1046 (Seventh Amendment prevents trial court from reducing jury verdict below the maximum award reasonably supported by the evidence).

■ Our own careful review of the extensive record in this case indicates that Judge Boyle did not abuse his discretion in ordering a remittitur and that his limitation of the award to $15,000 was proper. Despite the dramatic facts of this case, the liability defined by the parties, the jury verdict, and the evidence introduced—measured against the requirements of Louisiana law—do not permit a greater award.

It is important to grasp the restricted field in which liability could be found and damages awarded. First, the pretrial order limits the time during which the allegedly negligent acts took place to May through July of 1973. Second, the only actors found liable were unnamed physicians on the staffs of Drs. Murison and Ochsner: Drs. Murison and Ochsner themselves were exonerated by the jury; and the hospital and clinic, as entities, were excluded from liability by directed verdict.

■ Louisiana law takes a strict view of the evidence necessary to support a jury verdict in such cases as this. Under Louisiana Revised Statute 9:2794,[8] a plaintiff in a

---

8. L.R.S. 9:2794, passed in 1975, provides in relevant part:

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty,

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered

malpractice action must prove the relevant, standard of care,[9] demonstrate that the defendant's conduct breached that standard, and show that it was the legal cause of plaintiff's injury. The Louisiana courts have interpreted the statute to require expert medical testimony to prove the standard of care and to prove that the defendant violated it. *Steinbach v. Barfield,* 428 So.2d 915, 919 (La.App.), *writ denied,* 435 So.2d 431 (1983).[10] Even where, as here, a hospital accepts respondeat superior liability for the actions of a doctor on its staff, the plaintiff must meet these requirements. *Bryant v. St. Paul Fire and Marine Insurance Co.,* 382 So.2d 234, 237 (La.App.1980). The doctrine of respondeat superior is based on the notion that the liability of the master depends on that of the servant; thus "the duty of care at issue is that of the servant [the doctor] and it must be proved that this duty was breached before the master can be held liable." *Id.*

We agree with Judge Boyle's pinpointing liability to the July 9th episode and to no other. He found that the evidence in the record would support a jury finding of liability under the Louisiana standard of proof as to the July 9th administration of Cafergot. Dr. Ochsner testified that a vasocon-

strictant should not be given a patient being treated for acute arterial insufficiency. From the evidence introduced at trial, the jury could have concluded that a staff doctor gave Hemingway Cafergot, a vasoconstrictant, on July 9th, when he knew or should have known that the patient was being treated for acute arterial insufficiency. Dr. Ochsner's testimony and the medical records support the conclusion that Hemingway's severe and immediate reaction was caused by this administration of Cafergot.[11] The trial court also held that the evidence would not support finding any other acts of the staff doctors negligent under the Louisiana standard. Our own evaluation of the medical evidence, against the yardstick of the Louisiana malpractice statute, confirms this assessment. Plaintiff's argument that the June sympathectomy would not have been necessary had doctors on Dr. Ochsner's staff informed him that Dr. Murison had been prescribing Cafergot to the patient is sheer speculation.

Judge Boyle also found that the latest date of evidence as to injury caused by this administration of Cafergot was in mid-August and limited the damage period accordingly. In this he was correct: while Mr. Hemingway testified that he was continu-

injuries that would not otherwise have been incurred.

. . . . .

C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.

L.R.S. 9:2794 (West Supp.1983).

9. If general practitioners are involved, plaintiff must prove a "local care" standard; if medical specialists are involved, a non-local standard may be proved. In the instant case, it is not necessary to determine which of these standards is appropriate, since the standard of care was proved by the testimony of Drs. Ochsner and Murison.

10. Although neither party raises this issue, we note that we are not bound by the *Erie* doctrine to conform to the procedural rules of state law

as to what sort of proof is required to make out a malpractice claim under the state statute. Nonetheless, we find that the "expert testimony" rule is so closely interrelated with the substantive cause of action of malpractice in Louisiana that federal courts sitting in diversity cases should apply the state rule in order to fully realize state substantive policy. *See Conway v. Chemical Leaman Tank Lines, Inc.,* 540 F.2d 837, 838–39 (5th Cir.1976) (adopting state evidentiary rule to "give full effect" to Texas substantive policy in wrongful death actions); *E.L. Cheeney Co. v. Gates,* 346 F.2d 197, 206 (5th Cir.1965) ("As the Texas claim and the method of establishing it are so intertwined, we think the same ruling ought to be made by the federal court [on the procedural issue] whether it is bound by *Erie* or not.").

11. Our affirmance of the trial court's determination of liability also disposes of defendants' challenge to the denial of their motions for judgment notwithstanding the verdict and for a new trial as to liability; we uphold the trial court's denial of both.

ing to suffer pain in his left foot, the only evidence regarding the cause of that pain was that of Dr. Ochsner, who stated that these problems were due to Hemingway's diabetes and not to Cafergot. We find that Hemingway failed to adduce that "credible evidence" which would rebut the presumption in favor of the trial court's assessment of the "maximum possible" award.

The judgment below is

AFFIRMED.