# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 20, 2012        Decided July 13, 2012

No. 11-7037

PAUL DOUGLAS BURKE,
APPELLANT

v.

AIR SERV INTERNATIONAL, INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-02335)

*David E.R. Woolley* argued the cause and filed the briefs for appellant. *Malcolm L. Benge* entered an appearance.

*Frank A. Silane* argued the cause for appellees. With him on the brief were *Richard A. Lazenby*, *Ivy L. Nowinski*, *Thomas J. Whalen*, *Edward J. Longosz II*, *Mark A. Johnston*, and *Daniel A. Glass.*

Before: HENDERSON, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Plaintiff Paul Burke, a former British soldier, was severely wounded in an ambush in Afghanistan, where he was working for a private security contractor. Burke sued the transport company that furnished the helicopter he flew in on and the construction company that contracted with his employer for his security services, alleging that they had negligently failed to take appropriate security measures for his trip. The district court granted summary judgment for the defendants because Burke failed to proffer -- as District of Columbia law requires -- an expert to testify regarding the standard of care for such security precautions.

On appeal, Burke maintains that no expert was required because, inter alia, "every juror will have seen" such films as *High Noon*. Burke Br. 31. Perhaps. But even if they have, we are puzzled about what they could have learned from those films that would have been helpful to Burke's case. After all, Marshal Kane (Gary Cooper) did not helicopter to his confrontation with the Miller gang. Nor did he carry, as Burke did, a 9-mm. pistol and AK-47 assault rifle. No, Kane walked to the fateful encounter protected only by two revolvers and a tin star. Moreover, he did so notwithstanding that the meeting could hardly have been regarded as an ambush: as the film's title makes clear, each side knew precisely what time the showdown would take place.

We respect Burke's long military career and greatly regret the injuries suffered in the ambush, as well as the death of the helicopter pilot. But Burke's reliance on old Westerns rather than expert testimony to establish the standard of care is "fatal to [his] negligence claim." *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 848 (D.C. Cir. 2007) (internal quotation marks omitted). Finally -- and more prosaically -- the *Erie* doctrine is fatal to his alternative contention that we should disregard D.C.'s expert testimony requirement altogether.

I

Burke served in the British military for almost 23 years. He then became a security consultant for the United Nations World Food Programme in Afghanistan before accepting a riskier job for a private security contractor, U.S. Protections and Investigations (USPI), at almost twice the pay. The Louis Berger Group (LBG), one of the defendants, was a construction management company overseeing various projects in Afghanistan, and it hired USPI to provide security. LBG engaged the other defendant -- Air Serv International, Inc. -- to provide helicopter transport to its work sites.

During his time in Afghanistan, Burke had been ambushed "lots of times." Burke Dep. at 271-72 (Feb. 24, 2009). Indeed, just prior to the ambush giving rise to this case, he authored a memorandum describing the "tenuous" security situation in Afghanistan and the recent increase in Taliban attacks against non-governmental organizations. Paul Burke, USPI SC's Briefing for Schools and Clinics at 1 (J.A. 228). As Burke explained in his deposition, he was specifically concerned about "opportunist[ic] threat[s]" from the Taliban -- that is, unplanned attacks like the ambush at the center of this case. Burke Dep. at 129. Burke had also flown in Air Serv helicopters several times and was aware that they were not armored. *Id*. at 115.

Nonetheless, on February 22, 2004, Burke helicoptered to the village of Taluqan with an engineer and an interpreter to survey the progress of an LBG project. Burke, who was equipped with a 9-mm. pistol and AK-47 assault rifle, patrolled the area around the helicopter while others inspected the building site. As the party prepared to leave, unknown attackers opened fire. Burke and the others returned fire and radioed for help. The firing lasted about thirty minutes. Burke was shot five times; the pilot was killed; and the engineer was badly

wounded. The interpreter was able to call by satellite telephone for help, which arrived roughly an hour after the attack began.

In December 2007, Burke filed this action against LBG and Air Serv, invoking the diversity jurisdiction of the United States District Court. Burke alleged that both defendants were negligent in the security procedures they followed and the security equipment they provided, *see* Compl. ¶¶ 50-57, and that LBG was negligent in hiring and retaining his employer, USPI, to provide security for the aircraft and personnel, *id*. ¶¶ 58-70.[1] He did not, however, sue his employer. After discovery, the district court granted summary judgment for the defendants on two alternative grounds: that Burke had assumed the risk of his injuries, and that Burke had failed to proffer expert testimony regarding the standard of care owed to him by the defendants as required by District of Columbia tort law. *Burke v. Air Serv Int'l, Inc.*, 775 F. Supp. 2d 13, 21, 23 (D.D.C. 2011). Because the latter ground is sufficient to resolve this appeal, it is the only ground we discuss below.

II

Applying the choice-of-law rules of the District of Columbia to this diversity case, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), the district court determined that D.C.'s substantive law governs Burke's suit. "Neither party has objected to this choice of law on appeal, and, finding no apparent error in the District Court's choice, we shall

---

[1]Burke also alleged that LBG and Air Serv were liable for intentional infliction of emotional distress. *See* Compl. ¶¶ 71-73. Because his appellate briefs do not specifically address this claim, let alone marshal any evidence or legal authority in its support, it is forfeited. *See, e.g.*, *Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1367 n.2 (D.C. Cir. 2012).

apply District of Columbia law as well." *BWX Elecs., Inc. v. Control Data Corp.*, 929 F.2d 707, 710 (D.C. Cir. 1991).

In order to prevail on a negligence claim under D.C. law, a plaintiff "must prove the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (internal quotation marks omitted). Moreover, a plaintiff "'must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Briggs*, 481 F.3d at 845 (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). Accordingly, if expert testimony were required to establish the standard of care here, Burke's failure to offer such testimony would justify the grant of summary judgment against him. *See id.* at 848 (affirming summary judgment because, under D.C. law, failure to establish the standard of care is "fatal to a negligence claim" (internal quotation marks omitted)); *see also Varner v. District of Columbia*, 891 A.2d 260, 268-71 (D.C. 2006).

We agree with the district court that D.C. law requires expert testimony in this case. Burke alleges that the defendants were negligent in failing to equip his helicopter with appropriate radio communications equipment, bulletproof blast mats, and a bulletproof windshield; in not providing other personnel on the helicopter with body armor, helmets, and face shields; in not seeking air clearance permission from the proper authorities prior to the flight; and in hiring security personnel. Compl. ¶¶ 52-70. But the precise precautions a security contractor should take in a war zone are plainly "beyond the ken of the average layperson," *Briggs*, 481 F.3d at 845 (internal quotation marks omitted). As the D.C. Court of Appeals, adopting an old

dissenting voice from an analogous Second Circuit case, has declared: "[C]ourts should not leave it to 'a jury of tailors and haberdashers to pass judgment [unaided by expert testimony] on how to make a wet and rolling deck in a seaway a safe place to work.'" *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991) (alteration in original) (quoting *Zinnel v. U.S. Shipping Bd. Emergency Fleet Corp.*, 10 F.2d 47, 49 (2d Cir. 1925) (Hough, J., dissenting)).

Burke maintains that the standard of care in this case is "'within the realm of common knowledge and everyday experience,'" *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009) (quoting *Arnold & Porter*, 756 A.2d at 433). But the D.C. Court of Appeals has required expert testimony in scenarios far more familiar to the average juror than an ambush in Afghanistan.[2] And as our court has noted, "expert testimony is routinely required 'in negligence cases . . . which involve issues of safety, security and crime prevention,'" *Briggs*, 481 F.3d at 845-46 (quoting *Varner*, 891 A.2d at 267), including allegations of "negligent 'hiring, training, and supervision of . . . security personnel,'" *Farooq v. MDRB, Corp.*, 275 Fed. App'x 11, 12

---

[2]*See, e.g.*, *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000) (maintenance of leaning trees); *Scott v. James*, 731 A.2d 399, 400 (D.C. 1999) (application of hair relaxer); *Tillman v. Washington Metro. Area Transit Auth.*, 695 A.2d 94, 97 (D.C. 1997) (tightness of handcuffs); *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995) (cushioning for the ground underneath playground monkey bars); *Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322-23 (D.C. 1994) (maintenance of street lights); *Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C. 1988) (response when a prisoner is found hanging in his cell); *District of Columbia v. Freeman*, 477 A.2d 713, 719-20 (D.C. 1984) (installation of a crosswalk -- instead of a stop sign, light, or crossing guard -- at an intersection).

(D.C. Cir. 2008) (quoting *Predzin v. DC Arena Ltd. P'ship*, No. 02CA 9582, at 5 (D.C. Super. Ct. Oct. 7, 2003)).

Our decision in *Godfrey v. Iverson* is not to the contrary. That case involved a brawl at a D.C. nightclub. In the course of the brawl, the bodyguard of the defendant basketball star beat up the plaintiff, who then sued for negligent supervision. We held that no "expert assistance" was needed to "establish the standard of care for an individual who is present while his personal bodyguard, acting on his behalf in clearing a room in a nightclub, beats a customer and causes significant injuries." 559 F.3d at 573. Burke attempts to convert this holding into a broader principle that expert testimony is never needed to establish the standard of care for supervising security personnel. But the difference between a barroom brawl and an ambush in a remote Afghan village is self-evident.

Finally, Burke insists -- in all seriousness -- that lay jurors could have intuited the proper standard of care from their knowledge of old Westerns. "Afghanistan," he explains, "is comparable to the old 'Wild West' -- lawmen, builders, farmers, ranchers, schoolteachers, entering savage areas subject to armed marauders and trying to establish peace, civilization and the rule of law." Burke Br. 30-31. Because "[e]very juror will have seen Gunsmoke or High Noon or the Outlaw Josey Wales or Lonesome Dove," every juror will know the proper standard of care. *Id*. at 31.

We do not understand what relevant standard of care jurors could have gleaned from these Westerns, let alone how it could have benefited Burke. As to the first point, it seems plain that films in which the heroes rode horses and carried six-shooters can tell the jury little about whether helicopters should be equipped with satellite radios and bulletproof blast mats, or whether security personnel should be equipped with body armor.

As to the second point, we must have seen different versions of these Westerns than Burke did. In the versions we saw, the heroes took hardly any special precautions at all before heading into their confrontations with the outlaws. Will Kane, for example, set out to meet the fearsome Miller gang with only two pistols and his marshal's badge. And as we have noted above, this was despite his having had time to take whatever other precautions were available. Frank Miller, after all, was not arriving until the noon train. *See High Noon* (Stanley Kramer Prods. 1952).[3]

## III

Burke further contends that, even if D.C. law does require expert testimony in his case, that requirement should not be applied in a federal court under the *Erie* doctrine. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).[4] This circuit has never expressly addressed that contention. We have, however, routinely applied D.C.'s expert testimony rule in diversity cases.[5]

---

[3]Due to the cowardice of the townspeople, however, the precaution of raising a posse was unavailable to Marshal Kane.

[4]*See Hall v. C & P Tel. Co.*, 793 F.2d 1354, 1356 (D.C. Cir. 1986) ("It is now well established that this court will apply *Erie* principles to the decisions of the District of Columbia Court of Appeals."); *see also, e.g.*, *Schleier v. Kaiser Found. Health Plan of the Mid-Atlantic States, Inc.*, 876 F.2d 174, 180 (D.C. Cir. 1989).

[5]*See, e.g.*, *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 225 (D.C. Cir. 2011); *Godfrey*, 559 F.3d at 571-72; *Briggs*, 481 F.3d at 845; *Nat'l Tel. Coop. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 154 (D.C. Cir. 2001); *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001); *Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000).

The "broad command of *Erie*," of course, is that "federal courts are to apply state substantive law and federal procedural law" when sitting pursuant to their diversity jurisdiction. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). The Supreme Court has evolved a set of tests to determine whether a law is substantive or procedural for *Erie* purposes. The "first question" is whether there is a Federal Rule or statute, the "scope" of which is "sufficiently broad to control the issue before the Court." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980); *see Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 n.6 (1988). If there is, the Federal Rule or statute governs, state law notwithstanding, "unless it exceeds statutory authorization or Congress's rulemaking power." *Shady Grove*, 130 S. Ct. at 1437 (citing *Hanna*, 380 U.S. at 463-64); *see Gasperini*, 518 U.S. at 428 n.7.

Burke argues that the District's expert testimony requirement conflicts with Federal Rule of Evidence 702, and that the latter must therefore control.[6] We disagree. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

---

[6]Congress adopted the Federal Rules of Evidence by statute in 1975. Pub. L. 93-595, 88 Stat. 1926. The Rules "may be amended as provided in" the Rules Enabling Act, 28 U.S.C. § 2072. FED. R. EVID. 1102.

> product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As is apparent, Rule 702 determines the circumstances in which expert testimony is *permitted* (i.e., admissible). The District's rule, by contrast, defines a circumstance in which expert testimony is *required*. A federal court can simultaneously apply both the federal standard regarding what qualifies as expert testimony and the District rule regarding when qualified expert testimony is required. They "can exist side by side, . . . each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752. Thus, because Rule 702 does not "answer[] the question in dispute" -- whether the plaintiff is required to proffer expert testimony to satisfy his burden of proof -- it does not preempt the state rule. *Shady Grove*, 130 S. Ct. at 1437.

Even if Rule 702 does not resolve the issue, Burke maintains that the District's rule is unreasonable and that we should ignore it as a matter of federal common law. But when, as here, "no federal statute or Rule covers the point in dispute," *Stewart Org.*, 487 U.S. at 27 n.6, we must apply state law if it is "outcome-determinative" in the relevant sense. *Hanna*, 380 U.S. at 468; *see Gasperini*, 518 U.S. at 428.[7] To make that determination, we ask whether the failure to enforce state law "would disserve the so-called 'twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable

---

[7]The Supreme Court has suggested that the outcome-determinative test may be "an insufficient guide in cases presenting countervailing federal interests." *Gasperini*, 518 U.S. at 432 (citing *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 537 (1958)). Burke has not identified any countervailing federal interest in this case.

administration of the laws.'" *Stewart Org.*, 487 U.S. at 27 n.6 (quoting *Hanna*, 380 U.S. at 468); *see Gasperini*, 518 U.S. at 428. The decision whether to apply a state law under *Erie* must be made across the board; if *Erie* commands application of a state rule, the rule applies in *all* diversity cases in federal court, and vice versa. Therefore we do not simply consider whether application of the District's expert testimony rule would encourage forum shopping or be inequitable in this case alone. That is, whether or not Burke himself might have been able to find an expert to support his claim is not dispositive.

With this framework in mind, it is clear that we must apply D.C.'s requirement of expert testimony because failing to do so would undermine the twin aims of *Erie*.[8] There will certainly be

---

[8]We note that other circuits have applied similar state rules under *Erie*. *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750-51 (3d Cir. 1994) (holding that a Pennsylvania rule, requiring experts to testify about causation with a "reasonable degree of medical certainty," is "an element of [the] plaintiff's burden of proof" and therefore a "substantive" rule that "governs in federal court"); *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 170 (7th Cir. 1992) ("[W]here a state in furtherance of its substantive policy makes it more difficult to prove a particular type of state-law claim, the rule by which it does this, even if denominated a rule of evidence or cast in evidentiary terms, will be given effect in a diversity suit as an expression of state substantive policy."); *Hemingway v. Ochsner Clinic*, 722 F.2d 1220, 1225 n.10 (5th Cir. 1984) ("[W]e find that the [rule requiring expert testimony to prove the standard of care] is so closely interrelated with the substantive cause of action of malpractice in Louisiana that federal courts sitting in diversity cases should apply the state rule in order to fully realize state substantive policy."). *See also* 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 6263, at 204 (1997) ("[S]tate law controls where it makes a precondition to recovery in a medical-malpractice action the proffer of expert testimony to prove an

tort cases involving areas of scientific or professional expertise in which plaintiffs will be unable to find (honest, qualified) experts who will testify that the defendants violated the relevant scientific or professional standards. If brought in D.C. Superior Court, such a case would be dismissed without ever getting to the jury. If we were to refuse to enforce the D.C. expert testimony requirement, however, the same case would reach the jury if brought in federal district court. Such a result would be outcome-determinative in the relevant sense. It would be likely to "cause [the] plaintiff to choose the federal court." *Hanna*, 380 U.S. at 468 n.9. And it would constitute "an 'inequitable administration' of the law" because an action based on D.C. law, which would be dismissed in D.C. Superior Court, would "proceed through litigation to judgment in federal court solely because of the fortuity that there is diversity of citizenship between the litigants." *Walker*, 446 U.S. at 753 (quoting *Hanna*, 380 U.S. at 468). Accordingly, we must enforce the D.C. rule and affirm the judgment of the district court.[9]

---

element of the substantive-law claim, such as standard of care or causation." (footnotes omitted)).

[9] As a last ditch effort, Burke urges us to reverse the district court because it denied his request, made in his opposition to summary judgment, that the court reopen discovery to allow him "to try to find and designate such an expert" if the court "believes that the jury must receive expert evidence as to the standard of care." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 19. We review such denials for abuse of discretion, *see Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006), and find no abuse here. As the district court noted, "Burke filed his case in this forum; he should have considered -- at least before the summary judgment phase -- that its law might be applied to his claims such that an expert was needed." 775 F. Supp. 2d at 21 n.12.

13

IV

For the foregoing reasons, the district court's grant of summary judgment in favor of the defendants is

*Affirmed*.